The University of Illumina is a multi-disciplinary university located in Columbia, Illumina, USA.  The University of Illumina is a multi-disciplinary university located in Columbia, Illumina, USA.  The University of Illumina is a multi-disciplinary university located in Columbia, Illumina, USA.  Good morning, please be seated. The first three cases are going to be argued together, and we appreciate that. We think it's the most expeditious way to do it. The cases are 14-1547, 14-1548, and 14-1550, Trustees of Columbia University v. Illumina. Mr. Wilson, 24 minutes to start, whenever you're ready. Thank you, Your Honor, and may it please the Court. These appeals arise from Interparte's review of three related patents on aspects of DNA sequencing technology invented by Dr. Jingwei Zhu of Columbia University. Dr. Zhu invented novel nucleotides for use in a method of DNA sequencing known as sequencing by synthesis. Now, the general concept of sequencing by synthesis was proposed in the late 1980s, but for 10 years after the idea was first proposed, researchers had made no progress in developing a nucleotide that would actually work. What researchers found was this was a highly unpredictable part, and each feature of the nucleotide potentially affected whether the nucleotide could be incorporated successfully by the polymerase. What Dr. Zhu recognized was all of the elements that, in combination, were necessary for high-throughput, commercially viable sequencing by synthesis that would actually work. Let me just throw you a little housekeeping question to start. In the red brief at 48, Illumina says Columbia waived its arguments for claims 11 and 12 because it didn't argue non-obviousness in the Interparte's review. Did you argue non-obviousness? We did, Your Honor. Yes, we argued non-obviousness for 11 and 12. Where would that be in the record? I'll need to check the record. Okay. Let me know when. Okay. To return, it was the complete combination of features that were necessary for sequencing by synthesis would actually work. A removable cap on the 3'OH group, and a label on the base, and a cleavable linker, and using a diazepurine to connect the linker to the purine. Let me ask you, what do you say, I'm sure I'm mispronouncing it, you know, peramecine or cyane or whatever it is? Dr. Chen. Pardon? Dr. Chen. Okay, I had it wrong all the way. But what do you say that reference does not teach? Well, two things. That reference does not teach a nucleotide that has a combination of base labeling, cap on the 3'OH, and cleavable linker. So although Dr. Chen certainly does propose three different possibilities for sequencing by synthesis, you know, and his main focus is certainly on the 3'OH, not on the base labeling, he does mention the possibility. He does mention base labeling. He does, but he never puts those three elements in combination. And he certainly does not teach himself a diazepurine. So the question is that I think where the board fundamentally went wrong. The diazepurine from Prober, correct? Well, he did not. You say it's zinc. He did not get the diazepurine from Prober, exactly. He certainly cites Prober, and he also cites another reference, Sarfati, for saying, you know, it's possible to put fluorescent, it's possible to put labels on base in, you know, ways that might be useful. But the thing is, you have to keep reading. And when you turn the page, you see he's getting, what he's citing Prober for is labeling pyrimidines. He's not citing Prober at all for labeling purines. And in fact, when he talks about labeling purines, he says, oh, you know, the best place to label a purine would be on the 8 position, not the 7 position, which is what Prober had proposed. And Prober, of course, had proposed that for a different technology, which is Sanger sequencing. Now, you have to think about what was the reason why Prober was interested in the diazepurine. And the reason why he was interested is very different from the reason why Dr. Ju found the diazepurine to be very useful. Fundamentally, Dr. Ju found the diazepurine to be very useful for a spatial reason. That is, he, the researchers who had tried and failed during the 1990s to solve the problem of sequencing by synthesis had all, there was a recognition that there was a spatial problem. That is, where were you going to put the label physically so that it wouldn't interfere with other reactions, either the… What was going on with the sugar? Right. Some people had tried putting on the sugar, and that, those efforts to put it on the sugar had continued well into the 1990s. And a few researchers had said, it's very strange, you know, this seems like it ought to work, but for some reason it's not working. Notably, they did not say, since it's not working, let's try putting the label on the base, even though they were well aware of Dr. Chen's paper. So, they weren't drawing the lesson from those experiments that they, that Illuminis says they ought to have drawn from putting Chen and Kroeber together. What they were saying is, let's try something else, let's fiddle with the polymerase, or let's do something else to the molecule, not putting the label on the base. What Dr. Chu recognized… Let me, in sort of the post-KSR world, if you will, doesn't the combination, at least in terms of the 698 patent, of Sheen? Chen. Chen. That's how I pronounced it. My apologies. That's how I pronounced it anyway. Doesn't that combination, that reference with Kroeber, get you pretty far in terms of… I don't think that's right, Your Honor, because this is not a mechanical patent. In other words, we're dealing here with a very unpredictable art. This is very advanced synthetic nucleotide chemistry, and as Columbia's expert pointed out, any time you change any aspect of a nucleotide, you change, I'll put the label here, I'll put the cap here, I'll change which cap I use, I'll change which cleavable linker I use, and Kroeber doesn't have a cleavable linker at all. That could alter the reactions. That could make the reactions… I appreciate what you're doing, and I appreciate your very good background and helpful background. It seems to me, though, the reality you're living under is you've got a very, very, very detailed board opinion there, and you're left so… I mean, is there anything here that you're arguing that doesn't get substantial evidence deference for the board in terms of its findings, and can you identify there what went wrong? Because they go through, I mean, meeting the opinions, they're very detailed, they go through all of the expert testimony, and they draw a very clear picture, which, just to be very candid with you, strikes me as very complete and thorough. So I would say there were three fundamental errors that the board made. The first fundamental error is, I think, and this is most manifest in its treatment of the objective evidence, the board fundamentally is suffering from a kind of hindsight bias, and the board did not really treat the objective evidence in the case as sort of an independent way of looking at the evidence of obviousness and sort of really seeing, you might see looking back on what had happened, you might say, oh, it was all laid out in a path by the technology, but the objective evidence tells a very different story. I mean, in particular, the licensing evidence, that tells us that when there was a report of Dr. Ju having solved the reversible terminator cleavable dye issue, Illumina immediately sprang into action and said, we'd really like to license this. We don't have a play in sequencing by synthesis. How can we talk to Dr. Ju? We trust what Dr. Ju says if he says that he's solved this. And there were extensive negotiations with Columbia about licensing. Eventually, those negotiations didn't bear fruit because Columbia chose a different licensee, but there's certainly no indication that they didn't bear fruit because the parties value the technology very differently. And there's no question that Illumina's effort to license this technology, it was about this technology. I mean, the parent patent to this is in the list of technology that Columbia provided Illumina under their confidential disclosure agreement. Do we know at the time of licensing whether Illumina knew about the Chen patent? Well, I mean, the Chen, of course, Chen is a patent application, not a Chen patent. I mean, there's no indication. I mean, they certainly don't say in their email traffic, oh, this is what we're really interested in, the Chen technology. I mean, I think that to the contrary, since it was phrased that Dr. Ju has solved the reversible terminator cleavable dye issue, there was a recognition that advances in the technology had stopped and there was a problem to be solved. And that problem was solved by Dr. Ju's insight, fundamentally his spatial insight. So you have Illumina's eagerness to license the technology. You have Illumina's commercial success. And here the board did make a fundamental legal error, which is the board did not apply the presumption of nexus that this court has stated in several opinions comes from when you have commercial success from a product that embodies the invention. There's a presumption that the commercial success is due to that invention. And the burden then shifts to Illumina, or then is, I should say, is on Illumina to show. And what did the board say here about the commercial success? Well, the board says that the commercial success, the board says that Columbia has not shown that the commercial success was due to, you know, only to the diazepurine and not to, you know, not to the technology that was in the prior art. The board didn't say it was due to, you know, extraneous factors like customer service or something like that. But that is another, I think, basic error in the board's scope of its decision, because you have to look at the invention as a whole. Yes, there were elements of the technology that had been discussed in disparate places. But whose burden is that? I mean, if there's some elements that were in the prior art, elements of the whole, and there's one additional one and the board concludes that you have, aren't you, isn't your obligation to show that for purposes of commercial success that it was the inventive portion of that that led to the commercial success? Well, I think if we, you know, we are entitled to a presumption that it is if we produce evidence. I mean, we certainly have a burden of production. And we satisfy that burden of production by showing, you know, Illumina's products embody the invention. There's not really a dispute. The board didn't really doubt that. Illumina has had commercial success with that invention. You know, the board didn't really dispute that. And, you know, you have to really look at the invention as a whole, because it's not like the three pieces together were working. And then it's not like Illumina had a car and Columbia proposed to put a hood ornament on the car. You know, the three pieces together, either separately or together, that Illumina says were in the prior art, the base label, free primary wage cap, and cleavable linker, those three pieces together were never working together. There was no, there wasn't any commercial embodiment that together had been used, what certainly was successful. It was with the addition of the diazepurian that the whole, and diazepurian attached to the base by the cleavable linker, that the whole thing really works and works dramatically well. So that I think is, I think, you know, the board said, well, you have to sort of see what, sort of what the prior art was readily, you know, what was readily available in the prior art. But I think you can't just look to sort of the theoretical possibility that there might have been things available in the prior art because nothing was, nothing was on the market, nothing was actually working. So it's really only again with the, it's really again only sort of like putting together all the pieces, but not just putting together, actually synthesizing them from scratch. I mean, this isn't a mechanical art where it's just a question of taking a, you know, a rotor off one place and putting it off another. I mean, as Columbia's expert explained, starting from the prior art and developing the chemistry that it would have been necessary to get you from point A to point E was enormously complicated. And one thing that the board didn't really resolve or appreciate was, you know, who is competent to testify about how complicated it would be to get from point A to point E? Columbia had a chemist who was able to explain all that. You're talking about, weren't Dr., I mean, my sense was that both Dr. Treynor and Dr. Weinstock, is that who? Yes. Were both very qualified. And is this a sort of a Daubert issue as to, that you're saying Dr. Weinstock wasn't qualified? I don't think, well, Dr. Weinstock disclaimed the ability to talk to the chemistry that would be necessary to either synthesize, to synthesize the nucleotide, the brand new nucleotide. So he really was not able to talk to the question of how complex the chemistry would be. Now Illumina's response to that is, well, if he had chemistry, you know, a higher level of skill would have only meant it was more obvious. But I think what that argument really doesn't appreciate is really it's a person with the advanced chemistry who can really appreciate how unpredictable the chemistry is in synthesizing nucleotides and in synthesizing, you know, nucleotides that are not natural. So that they're, you know, they don't, they're not analogous. So is your argument, Mr. Wilson, basically that somehow the Illumina's case is weaker because Dr. Weinstock didn't have, while he's a competent gentleman, didn't have in your view the particular expertise background that was necessary for the subtle issues in this case? He did not have the background or, and he disclaimed the expertise to testify about issues that I think are at the core of this case. In particular, reasonable expectation of success in synthesizing the nucleotide and a reasonable expectation of success that the nucleotide would actually work, that it would actually be incorporated by a polymerase. And I think that the defect in the Illumina's argument is actually shown by the board's decision on those two very points because the board's decision on reasonable expectation of success of a polymerase doesn't rely on Dr. Weinstock at all. I mean, the board really relies on what I might call its own, you know, expertise, which is really a kind of a burden shifting where they say, well, you know, there are these two sort of, these two technologies that seem to be working separately, 3'OH cap and labeling base. You know, we dispute the premise of that, but even putting that aside, Columbia hasn't persuaded us that it wouldn't be perfectly sensible to put the two together and that they would work perfectly well together. One of the things that we seem to see, at least from time to time, is the argument that the board has gone too far in its, in relying on what I think you just described or referred to as its own expertise. Do you see that as an issue? I see that as a very significant issue here. I think that's a, that's a kind of a fundamental issue. In what particular area do you say the board overstepped that bound? I think you see it most, most, is most salient in reasonable expectation of success because in reasonable expectation... Can we be a little more specific? Sure. Do you want to show us? Sure. I mean, we've got three, three, eight board opinions. I think around pages, sort of... I've got, which one are you... Sorry, I'm looking at Appeal 1547, which is the 698. And I've got Commercial Success at page 834. Right. So, so the first thing I would say is when you look at sort of page 826 and 827, so page 826 there's a, if you see there's an italicized, was there a basis for reasonably expecting that a nucleotide with a removable 3'OH cap, etc. I mean, one problem with this is the board actually doesn't even answer that question. If you read the second paragraph, it's talking about an argument that Columbia is making. And they say, opening line of the second paragraph, this argument is not persuasive, indicating to me that essentially they're placing the burden on Columbia to show why it's not obvious. But then if you look at the last paragraph, the last sentence, secondly, a preponderance of evidence establishes a reasonable expectation of success as addressed above. It isn't addressed above. There's just no analysis of reasonable expectation of success of incorporation by the preliminaries. I'm not one. I mean, I realize that, you know, the other place where I think this... Well, it says, I mean, before the quote that you had the question, it says in sum the preponderance of evidence establishes there was a reasonable expectation of success. So what precedes it, the analysis that precedes it supports that conclusion, right? Well... And they're talking about... If that's what the board means, Your Honor, then all that they're talking about here is arguments by Columbia that they've rejected. And they don't rely on any arguments. They don't rely on any evidence by Dr. Weinstock. And on the previous page, there's an A24 and A25, which is, I think, where you have principally the discussion of reasonable expectation of success of actually incorporation by a preliminaries. You know, they do... There's a lot of discussion about how Dr. Treanor didn't explain or Dr. Treanor didn't... Dr. Treanor didn't persuade us. There's no discussion at all of what Dr. Weinstock did, what Dr. Weinstock said. So I think these pages are examples of where the board's decision literally lacks substantial evidence because it doesn't rely on any evidence presented by Illumina. And we infer that it only could have been relying on its own expertise, which under decisions like, you know, Brandy Miller is, you know, is not permissible under... It can't be upheld on substantial evidence. Excuse me. You start off by saying there were three specific problems in the board's decision. It was hindsight. Right. And the second one is... So the second one are the kind of burden shifting... What you just described. Right. Burden shifting, what I just described. And I also think burden shifting, you also see that in the hindsight. And then the third, I think, is fundamentally the board's failure to really appreciate that the question here was about the invention as a whole. And, I mean, that point sort of overlaps on some other points I mentioned. But the board sort of points to, you know, individual features in the prior art without appreciating the challenges of combining those features. You know, even no prior art, even Dr. Chen, suggested combining even the three features, base labeling, 3'OH capping, and cleavable linker into a single embodiment. Excuse me. And certainly no prior art suggested combining the fourth feature of a diazepurine, which was what made it very useful to attach the label by a cleavable linker. And then the board sort of dismisses a lot of those difficulties by saying, well, it would have been obvious. I mean, for example, you see in the board's discussion of Stemple and Anazawa, which is in the 1548 appeal, the board says, well, Anazawa's flawed. You know, his chemical processes actually don't work. And the board says, well, you know, some skilled in the art would have figured that out. You know, they would have figured out how to use Prover to fix Anazawa. You know, there's no evidence of that. You know, that's, first of all, burden shifting. And there's not any evidence of that in the record either. But fundamentally, I think, going back to maybe an objective point, the board also sort of lost sight of the fact that Chen and Prover are from 1990 and 1991, and there's a 10-year gap where researchers are persistently trying the path that Chen laid out, which is put the label on the 3'OH cap. That is no question his preferred embodiment. Researchers tried that, and researchers failed, and they couldn't figure out what was wrong. They couldn't figure out what the solution to that was. I think the board, this loops back into hindsight bias, but the board fundamentally failed to sort of appreciate there's this long period of time where there just doesn't seem to be the right answer. And that, I think, is... Are you saying this is kind of a quasi-secondary consideration, a passage of time? It's kind of a long-felt-needs type argument, but it's also, I think, a response to Illumina. I mean, one thing that Illumina has said is, you know, really the 3'OH cap label approach was, I think they use the term, fading alternative. And everybody knew that the... Everybody had recognized that the base labeling was really the more promising thing. But that's... When you look at the evidence Illumina points to, and when you look at the researchers who are working in this field in the 1990s, they're all trying... They are trying to put... They're not all, put aside Anuzawa, but the others, Welch, Metzger, they are trying to put the label on the 3'OH cap well into the 1990s. They're trying, and they're failing, and they don't draw from their failure the answer that Dr. Ju drew, which is put the label on the base with a cleavable linker attached to the purine through the acid purine. When we hear from... Thank you. Edward Reines on behalf of Illumina. May it please the court. First, to address the housekeeping issue, there was no defense of claims 11 and 12 in the patent owner's response, which is at A2167. Moving to the more fundamental question, what the board found and did it have substantial evidence, where the board started is I think where we should start today, and this is on the substance the right place to start, which is what was the interest level in the art in capping the sugar and labeling the base? Because that's really what they're claiming is the advantage of doing sequencing by synthesis where you cap the sugar, but you put the base not on the sugar, I mean the label not on the sugar, but on the base. And we've heard here nobody showed it, we've heard all kinds of arguments about how this was disfavored and so forth. And the board said, we hear you, you articulate, but that's not what the evidence shows. What the evidence shows in Dower, Stemple, and Shen is that that combination was taught. And in fact, one of the last things the council stated was that clearly in Shen it was a disfavored version of the invention. Not true. You'll find nothing in there that says that it's any less favored. In fact, if you read the summary of the invention,  he says we want to move away from electrophoresis, so we're going to do it sequencing by synthesis, and there's a number of ways you can do it. Let me just ask you one question. I wasn't, something Mr. Wolfson said, and this is a gap in my technology understanding, I will confess. Prober, he said, is directed to pyrimidines? Yes, the purine versus pyrimidines, yes. What is the significance of that distinction? The significance of that distinction is that they're making an argument that you wouldn't be motivated to use diazepurine with the combination of the cap on the sugar and the base label because in Shen, I mean really the better form of the argument, which we didn't really hear today, is that Shen says use the 8 position to attach the cleavable label when you use it on the base, and the claim requires the diazepurine at the 7. There is an avalanche of reasons behind that. I can start with this. No, I don't want to break up your flow. I understand that one question. Just to go back to the point you were making about the discussion, I mean the board recognized that Columbia may be right that Shen didn't say that the base labeling was the most favored, but what it said, which I think is a correct statement of law, is that that didn't constitute a teaching away, and just because there was a preference for one thing in Shen does not mean that the other disclosures in Shen weren't useful or necessary. Spot on. But even to put it the way I think of it, at a real common sense level, it's part of his invention. He's saying, I made an invention, and one way you can use my invention is to cap the sugar and label the base. So why would that be something you wouldn't want to do if someone's declaring that? What about the licenses? I mean, that's good evidence, is it not? I don't think it's much evidence at all. I mean, first of all, it's unconsummated. I don't think there's ever been a case by this court where an unconsummated... I mean, respect for the patent is your licensing it. I think having prevailed in a re-exam after refusing to acquiesce to a charge of infringement is the opposite of respect. We're sort of here because we didn't license it. So it's sort of backwards to say that we're respecting the patent by our conduct. What happened was there was initial license discussions. Importantly, we ended up licensing this technology from Solexa, which invented, there's a simultaneous invention, the evidence is in the record. There's no real contest about that. So we got the technology that we used. These claims didn't exist when they began. And then what you see is after 2007, 2008, is Columbia's approaching Illumina about the patent, saying, look, if we have this patent, do you want a license? And we basically said, we found a better solution. I mean, it's an unconsummated license. It hardly shows respect. It's not tied to any of the patents. It's not tied to any of the claims. And it's not tied to the feature that they say is inventive. I mean, the reality is, by the time you get through this record, they can't say that capping the sugar and labeling the base is theirs because Dower, Stemple, and Shen all show it, and they don't even really contest that. Now, one thing they do say, I mean, the most they can say about Shen and this embodiment is you have to cobble together. It's sort of a little bit of one from column A and one from column B, and you'd be befuddled. Their own expert at page 83794 states that Shen discloses an alternative nucleotide analog which includes a label attached to the base and the possibility of the label being attached to the nucleotide analog by means of a cleavable tether. That's paragraph 28, 83794. And the board pointed that out and said, your own guy acknowledges that Shen teaches it as his invention. And there was no argument about Dower, and there was no argument about Stemple. So any idea that there's this fundamental teaching that they have that you can cap the sugar and label the base just doesn't go anywhere because it's fully disclosed in the art. What about the combination with Provo? Okay, so let's talk about the Diaz edition. So the reality is that everyone agrees that during the course of the 90s, Diaz and Purines were ubiquitous. That's the word their own attorney used before the board. That's what the board was entitled to rely on, that they're ubiquitous. Diaz and Purines were so ubiquitous, you could buy them from a manufacturer made already. I don't know why you need a chemical degree to do that. Applied biosystems is mentioned in the record. Others are mentioned in the record. On top of that, our expert, Dr. Weinstock, explained that Diaz bases were used in the context of sequencing by synthesis, in the context of a cleavable linker. That's at paragraph 44 at A3177. So if you could just buy them off the shelf and attach them, it just makes it stronger. It's chemistry, but we can explain it relatively simply. It says instead of using on the base the nitrogen, which has three bonds, replace it with a carbon with four bonds. It's stronger. And it's not like that's a discovery. It was ubiquitous. Everybody was moving to Diaz's because when you put the label on the base, it would be stronger. One of the things that Mr. Wilson focused on in his argument was this 10-year gap that you heard him describing that. What do you have to say? That's an interesting point. What do you have to say about that? It's sort of intriguing. I must admit that when I looked at this record, that's the question that comes to me because I actually think of all the things kind of long-felt need can sometimes be a helpful tool. Why didn't people do it? The answer is A, people did do it because what that ignores is that's treating Shannon in isolation, not the record that's here, which is Stemple and Dower. That's at least two others that did everything. Keep in mind, in these PTAP proceedings, they're still looking at reference by reference. We had numerous, numerous references and you just have to narrow it down at some point. There's three places where they have that combination, but even more to the point, and the one that just sort of said, all right, there's nothing to this argument in my mind, is the commercial success that they're claiming really started in 2008, which is almost 10 years after they came up with their so-called invention. It sort of lets go back to first principles, right? That's always the useful thing to do when you start getting caught into who's burden and burden of persuasion and proof and going forward and all that legalese. When you ask yourself the common sense question of what's commercial success supposed to show, it says, well, if there's this big golden ring that you can grab, why wouldn't anyone have done it? Wouldn't a few people have been motivated to grab their ring, right? Well, if the ring was grabbed in 1999 or 2000 when June came up with a paper patent, how come it took 10 more years to make it something that was worthwhile and commercial? And the answer to the question is, experimentally, people knew that this was something you could do. They knew that you could demonstrate it, but to scale it up, there's so much more, and this goes to why the whole commercial success argument doesn't work. You need the arrays. You need a lot about the prep. There's actually a ton of technology in how you prepare these arrays with so many different parallel polynucleotides, so there's so much to that and the optics and everything else that you have to get right for it that it wasn't, everyone wasn't sitting around waiting for June to resolve this in 2000 to get this done, and Amersham did the same. Are you saying, Mr. Aronson, that there were a lot of issues not related to this invention that were impeding the process, if you will? Of making it a high-throughput commercial goldmine. That didn't happen until, the record will show, there's some claim that it's 2007 or something like that. It's really 2008 before they have actual evidence of any large-scale sales by us. But the other point is, you would think if it was a long-felt need and this person broke through because they had the stroke of genius, which is sort of the implication they're trying to give you, then why would Amersham did it at the same time, Selexa did it at the same time, Dower did it, Stemple did it around, Stemple's 1999, it's prior art, but it's right beforehand, so other people did it, and there's just no basis, and interestingly, the simultaneous invention, everyone used the Agis, so when you look at the Amersham technology, you look at Selexa, which is what we licensed in, everyone used the Agis because that makes the stronger bond. But one thing I want to get back to was the motivation to use the Agis because it became pretty clear from the board's initial institution decision that their central invention, if you read their patent, what they say the invention is, I mean, if you read the patent, what the invention is is the capping the sugar and labeling the base. That's what they're saying the invention is. And then we came back with this avalanche of evidence like three different anticipatory references, more, but at least three, and they just said, all right, well. And they dropped back and they said, well, it's the edition of the Diaz, and they had a dependent claim. That's not what the summary of the invention is telling you they invented, but that's why there's a little bit of a, when you hear dissonance from the other side's argument, that's what it is. So they're now trying to say it's the Diaz, and we put in pages of evidence, I think about 20 paragraphs from Weinstock nailing this issue, that the Diaz avoids GC rich problems, that the Diaz just makes a more stable linker that you'd want, and that you could buy it on the street. All that stuff's just of record. So now what's happened is, on appeal, when they lost on that attempt to rely on the Diaz as the real true nature of the invention, they're shifting back to other things. And none of the three arguments that they've made is at all persuasive. I can go through the three errors that they're saying and won't repeat myself, because I know how important everyone's time is. But starting with the objective evidence, there is no more, the commercial success, the way I think about it, the commercial success of Illumina is no more of a story of greatness for the Jew invention as it is for Dower or Stample or Shen. Because all of them have the combination of capping the sugar and labeling the base. So what the board says is, well, if your addition of the Diaz, which is what distinguishes you from those references, look, there's anticipation references here. We didn't hear anything about that, and there's really what, like a paragraph of argument where they make the argument like in Shen that you have to cobble it together. They don't really contest that Dower, Stample, and Shen disclose everything but the Diaz. You wouldn't get that from the argument, but if you look at the anticipation rejections, that's what you get, because they don't have an argument. That's how you know. The Diaz frame comes from Prober. Well, there's multiple combinations, and I'm glad you asked that question. The Diaz comes from Prober, but it also comes from the level of skill in the art. The fact that you could buy one on the street, the fact that it was ubiquitous, the fact that Silla, which is another combination, so I'm not, this is one of the references before the board with the combination of Shen and Silla, and Silla, the name of it is a 7-Diazopurine patent from the 80s, and in there they say, this is great, it makes a stronger label, and it prevents secondary structures, this GC-rich problem. Go on. I mean, the whole patent is about using Diaz in your DNA. And then they say, use it for anything where you're doing, having a DNA sequencing reaction. Not limited to Sanger. They will tell you that it's limited to Sanger. Their argument depends on it. How can they win otherwise? Well, it was focused on Sanger in Prober. That was the focus of it. Prober, but I'm now talking about Silla. Silla, okay. All Silla says, forget all Silla says, Prober is a landmark reference that taught terminators and had a whole bunch of technology in it. The reason they cited it, it's such a fundamental reference, everyone goes back to Prober. But Silla in many ways is a more interesting combination because Silla's just, use 7 Diaz as their grape for base labeling. And what they, I think what's important to understand in Silla is that in Silla, they do not limit themselves to Sanger. They say anything with DNA sequencing reaction. Well, this is a DNA sequencing reaction. And it's no different. In Sanger, you had a cap that was not removable on the sugar. Here you have a removable, and that technology's trivial, making it cleavable versus non-cleavable. They don't even argue about that. So, that already had the adjustment here and said, use the 7 Diaz here for a firmer base. What's the difference? Removable or non-removable? And it says, if you're using a polymerase, an enzyme, to incorporate the nucleotide, we're a good option for you. And that's in the 80s. That's the Silla reference. That is one of the combinations. Now, in Prober, let me go through, I think it's worth discussing going through Prober, and how that's referred to in Shen. In Shen, at page 28, on this occasion, it's kind of easier to use the internal paging rather than the appendix, but for reference, in Appeal 1547, this is A3029, it states, at page 28, Prober shows, at line 17, Prober shows enzymatic incorporation of fluorescent DDNTPs by reverse transcriptase and sequenase. You talk about your reasonable expectation of success. In Shen, he's saying, when you label the base, look at Prober, because Prober was labeling the base and it was incorporating just fine. And he also had a cap on the sugar. And they say, this works fine. It's directing you, so what would one skill in the art do? One skill in the art would look at Prober to understand what worked. And that would be the Diazid design. And again, they didn't really develop this argument in front of the panel, but I mean, you know, it's sort of the best thing they got on Diazid. I just think, to accept this argument, you'd have to ignore that it's ubiquitous, ignore all the Weinstock evidence that's more than sufficient evidence alone, ignore the SILA combination, and ignore what SILA's teaching, and ignore, you know, a lot of other things that are documented in our briefs about why someone would use a Diazid. But they argue on page 29, which is the very next page, that the C8 position of the purine structure presents an ideal position. So that's what Shen likes. But that doesn't nullify the idea of using a Diazid, especially since, as everyone points out, there is... I know there's a difference, but what is the significance in the science between your being on a C7 or a C8 position, generally? I just don't have a sense as to whether that makes a lot of difference or not. I don't know if it makes a lot of difference, but the C7 position is where you can substitute the nitrogen for the carbon, and therefore get a stronger bond. But you can't do it at the C8 position? I don't know if you can. I don't know that people explored that. But like I say, the real point is, over the course of the 90s, everyone moved to Diazids. So their own, as I said, their argument isn't that Diazids weren't ubiquitous. Their argument isn't that when you base label, everyone was using Diazids and you can buy them commercially. Their own expert trainer acknowledges that, and he has to. Their argument is, somehow, if it was great and standard for Sanger sequencing to get a really strong label of the base  that wouldn't translate over to sequencing by synthesis. That's the best form of the argument. But the problem with that, among other problems, in the fact that they've never explained the reason why anyone would care about that difference. You hear, it's all unpredictable, it's chemistry unpredictable. This panel is too experienced to fall for that kind of, all chemistry isn't unpredictable. In fact, we've established here that they, maybe the most important fact on this, and maybe this is the right, maybe where I should start it and maybe I'll regret it when I re-listen to this, is that June himself, when he wants to describe the use of the Diazid purine, says this is just well established and refers to Probert and refers to Lee and refers to Hobbes and doesn't explain how to do it. This is this unpredictable science. He just says, well, it's all well established. You know what it is. You hear people say, that's binding, as this court knows, but it's also just common sense. If he doesn't want to have to describe how to do it, then how unpredictable is it? And if he's just saying, and this is, he says, described as well established and then cites three different references. Now, they make arguments and I thought some of them did border on more weak than you'd like to see, was that, well, because there's three different references cited for how well established it is to use Diazids and how easy the chemistry is, that it's some combination of the three, which is complicated. He actually argued that, I think in the reply brief, it's like, come on. They're giving you three references from a long time ago that all show it's well established. So their invention is the addition of a Diazid which their own inventor describes as not his invention but well established. But beyond that, in case that wasn't enough, at paragraph 59 at A3178, and this is Weinstock, Weinstock typically says, he just nails the Diazid issue, but he says, their argument is what I just described because it's the only thing that... You mentioned Dr. Weinstock who we had, at least I had a little bit of a colloquy with Mr. Wolfson about this issue about the credentials. Well, it's not really the credentials. I mean, I think both sides would agree that Dr. Treanor and Dr. Weinstock are very educated and competent and so forth. But this argument, I think, that Mr. Wolfson is making that there's, at least for purposes of this case, there's a little bit of a gap in Dr. Weinstock's expertise. And it's true that Dr. Weinstock did candidly make some admissions. What do you... What's your response to that? Very fair question. I want to first say again, echoing observations made previously, that the board was thorough in this matter. They looked at the qualifications and that's at A3 and concluded him qualified as I think Your Honor did too. But let me get directly to the question. His job, he was at, there's three main genome centers in the United States. There's one at Harvard, one at George Washington, and one at Baylor. He worked at two of them as director. The job at those genome centers, they got large scale. This is a human genome project and follow on work. His job was to go around, and it's in his declaration, to go around and evaluate advanced DNA sequencing technologies to know what was out there, what was new, what was going to work, and be a beta site and interact with. I can't think of a better positioned person to understand. Well maybe Mr. Wolfson would say, and I don't want to put words in his argument, but maybe he would say, well that's fine, he's very, obviously he has an important position, he's very accomplished, but it's not a hands-on type type of thing in the chemistry like Dr. Treanor or maybe other people are. Maybe I'm misinterpreting his argument. He did say it was hands-on. My point is if you're looking at what the new sequencing technologies are, you need to have an interdisciplinary, obvious, I mean it's obvious, you need to have knowledge of physics, biochem. He had a biophysics degree, he did his post-doc work at Stanford in biochemistry, he was not unsophisticated in what was needed to know. The point, really the point getting directly what the concern is, which is almost... Well the board, in addition, the board had the opportunity to test the expertise of both of these women. They were cross-examined for hundreds and hundreds of pages and that was all briefed and argued for long periods. But the underlying concern, I don't think really, is a qualification of Dr. Weinstock. I mean, he's a professor. No, it's not a downward issue. The question is, is the organic chemistry the tough stuff here that's really the invention? I think that's what it is, as compared to will it incorporate? If you cap the sugar, label the base, would you want to use it as is and would it work? Let's not over-complicate things. And the answer is, with respect to the addition of the diazo, which is where they're saying the invention is, their own patent doesn't say that it's any chemistry. It says, go look at these old references, 10 years plus old, you can proportion them, and you can find this chemistry. So it wasn't a synthetic chemistry problem because  and the patent doesn't add it. On the linker, I think this is interesting. On the linker, and this comes up in 869, it's not so important to what's being questioned here directly, but secondarily it is, there's claims where they refer to three different ways to cleave the label when you're moving to the next base. Actually, they claim more than that. They claim using photography, using heat, using physical means, and using chemical means.  they disclose and their expert admitted it in that position is photo, using photo, using light to disassociate it. They don't say, go look at and they don't explain, they claim it, but they don't explain how you use the linker for chemical cleaving. They don't describe how you do it physically to get rid of the label when you need to get rid of it. But they claimed it all in claim 12 and all they showed was the use of light to eliminate it. So the linker can't be the fancy chemistry because they don't give you any embodiment but they claim it four different or five different ways. I think they even include physical chem, physical chem. They don't have any embodiment in there. The capping the sugar, you would have heard arguments from counsel, formidable as he is, that, well, capping the sugar, that's hard, how do you do that? You didn't hear any argument that there's a challenge there. So there's no challenge in organic chemistry. I mean, there's, and I don't like to say this, but there's hand-waving there because that's the only place you're left to go when you understand that the diases are every day and the rest of it is in reference after reference undisputed based on anticipation rejections with not much of any kind of contest. So, if there's not real chemistry to do, what you really want is someone to say, well, you put these pieces together and then we'll incorporate it with an enzyme and biophysics and biochemistry and microbiology. You're saying, what you're making the argument, as I understand it, Doronis, is that even if Dr. Weinstock maybe at the point in time that we're dealing with here wasn't as hands-on in terms of the laboratory, what's relevant to this case, he had more than enough expertise. Absolutely. And the board self-founded as more than, Judge Wall explained, as more than sufficient evidence of that. I mean, this appeal is turning into sort of an argument on a de novo level because we didn't really get legal arguments and so I'm contesting them. I think everything I say has got to be through the lens of sufficient evidence. I'm not particularly worried about that because it's overwhelming. I hope I've laid out where the heart starts and the minor addition that they're claiming and how weak that is as we've described. Now, I want to make sure that I've covered his three arguments. The Weinstock unqualified, I addressed. The objective evidence, I don't know if there's anything more on that. If it was such a great invention and he turned the key that opened the door, how come it took so many years for someone else to do it based on different license technology? I think I addressed the licensing. And then the final thing with this invention as a whole. And, you know, I think the invention as a whole, yes, of course, you have to look at the invention as a whole, but what the reality is, you know, and we learned this from Graham, is that you have to look at the difference between the art and what's claimed, at least for the obvious decisions. And, really, this comes about because they want to ignore that feature and the board just wasn't due. The board, I think, safely concluded that the disclosure of the cap on the sugar and the label on the base was well known on multiple references. Are there any questions or anything else that I can help with? We're fine. Okay, thank you very much. Thank you, Your Honor. I want to start by addressing Judge Wallach's question about claims 11 and 12. So, as you recall, we actually proposed substitute claims in our motion to amend. And we argued the non-obviousness of proposed claims in 25 and 26. They were substitutes for claims 11 and 12. And the argument appears on page A2191 of the 698 appendix. Dr. Treanor's relevant testimony is at page A2191. Dr. Treanor's relevant testimony is at page A3855. And this also is treated in page 22 and 23 of our reply brief. Let me just throw one more question since you're addressing mine. Mr. Reines said he was talking about licensing. And he raised something I'd like you to answer. And that is, where in the licensing negotiations is there a tie to any of the features or inventions and so on, and what do you list? So, I mean, I think you start with the first email that starts us, which is an email from between two of Illumina's chief scientists, which is, Dr. Jew has solved the problem that, you know, has Spiney to solve. You know, so he's solved the problem. And then you get, you know, you get a back and forth between Illumina and Columbia. There's an agreement to, right, there's an agreement to, and this appears, the key email is at page A3993 of the 698 appendix. This is appeal 1547. And, you know, later on you see, you know, or farther down in the email chain, actually it's earlier, you know, somebody from Illumina says, we don't have a specific project or initiative to do sequencing by synthesis. And then somebody else says, currently Illumina doesn't have a play in this area. Now, Mr. Ryan said, well, you know, this is just, this is unsuccessful licensing. This is attempted licensing, not consummated licensing. That's true. But, I mean, there's certainly no doubt that this is a respect for the convention. I mean, the whole theme of this is, you know, if you continue reading a couple of pages later, you know, the whole theme of this is, you know, if Dr. Jew says he solved it, you know, I would believe him is what, is the back and forth between the folks in Illumina. And then you have, you know, and this is not just in 2005, 2006, 2006 the negotiations break down. Columbia licenses somebody else. Illumina jumps into the market by acquiring another company and immediately has success with the products that embody this invention. And yet, interestingly, well into 2008, 2009, 2011, there are still discussions in Illumina still saying, you know, we'd really, you know, we would have really liked to license the Columbia patent, but, you know, we have a problem with the fact that you license somebody else. There's some more discussions. Oh, I'd love to come and, I'd love to come and see your lab. Let me fly from, let me fly from San Diego to Boston. I'll be there, you know, I'll be there as soon as I can. This is definitely respect for the invention. I mean, no question. If I, if I could answer just one technical point about the, the purines and the pyrimidines and the C7 and the C8, so there are four bases, of course, in DNA. Two of them are purines, two of them are pyrimidines. The two purines are larger, they're double rings, and so that creates part of the problem about putting the, you know, where to put the, the label by the cleavable linker so it doesn't get in the way. What Dr. Chen thought was, mistakenly, was that the eight position was the right one, but the eight position is not the right one because of spatial considerations. So you, in order to make it work best, you have to put it at the seven. The problem is the seven in a natural purine is a nitrogen and that's not good for the bond of holding the, the cleavable linker. So you have to change the nitrogen to a carbon. You have to make one, I should say, that has a carbon rather than a nitrogen and that helps, and that helps with the bond. Now, Mr. Ryan said, well, like everybody knew diazepurines were great. Diazepurines were used in Sanger sequencing. I mean, they were used for two different reasons that are completely irrelevant to sequencing by synthesis. The first reason they were used, and this is Sela, had to do with the fact that when you're, when you're sequencing, you know, bases that have a lot of GC, GC, GC, they tended to kind of clump together and for some reason, you know, people were trying to fix that and Sela figured out that diazepurines, switching it to a diazepurine from a regular purine would solve that problem. That has nothing to do with the problem that Dr. G was facing. That has solely to do with the process of electrophoresis, which is under Sanger sequencing, which wasn't satisfying to people because it takes a really long time and it can't be automated the way that sequencing by synthesis can be. The other was a separate problem that Dr. Kroeber figured out and, you know, this was a significant advance, no question, in Sanger sequencing, which was you have to keep a, he figured out you put the label on the base. The problem with it is electrophoresis is a very kind of harsh process and what he figured out was when you were sort of playing out all the strands, if you use a diazepurine instead of a natural purine, the label will stay on, you know, and his label is an uncleavable linker, so it's totally different from the whole, you know, there's no question, you know, Kroeber made an advance in Sanger sequencing, but the whole problem, the problems that they're trying to solve are totally different from the ones that Dr. Ju was solving, which is where would the label fit so that it could, so that it could not get in the way of everything else and it has to be cleavable because when you detect the label, you know, there's a cap, you detect the label and then the cap and the label have to fall off so that you can then repeat the process. It's all of those put together that fundamentally are what made SPS work as well as it has and those, fundamentally, all those put together are what Dr. Ju conceived. Thank you. Thank you. We thank both counsel on the case.